# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MARVIN TERRELL CARTER      *

Petitioner      *

v      *      Civil Action No. GJH-17-3374

WARDEN RICHARD J. GRAHAM and      *
THE ATTORNEY GENERAL OF THE
STATE OF MARYLAND      *

Respondents      *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION</u>

In answer to the above-entitled Petition for Writ of Habeas Corpus Respondents seek denial of the relief sought. ECF No. 6. Petitioner Marvin Terrell Carter filed a Reply (ECF No. 8) as well as a Motion for Summary Judgment. ECF No. 7. No hearing is necessary to resolve the matters pending. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2016); *see also Fisher v. Lee*, 215 F. 3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)). For reasons to follow, the Petition shall be dismissed and the pending Motion for Summary Judgment denied.

## I.  BACKGROUND

### A.  Pre-Trial Matters

Carter was convicted of three counts of burglary and two counts of malicious destruction of property in the Circuit Court for Montgomery County following a jury trial. At a pre-trial hearing, Carter moved for a substitution of counsel, insisting that the State had not turned over all discovery. ECF No. 6-2 at 7–10. Carter's trial counsel, a member of the public defender's

office, explained that Carter was referring to GPS evidence that did not exist because a warrant was never issued for police to pursue it. *Id*. at 11. Counsel further explained that the State did not intend to use the phone pinging evidence gathered in the context of another burglary case in Prince George's County. *Id*. The trial court ruled, pursuant to Md. Rule 4-215(e), that Carter did not have a meritorious reason for discharging his counsel, noted that counsel had prepared a complete and thoughtful pre-trial motion to sever and that discovery was requested and provided. *Id*. at 18–19. The trial court further noted that Carter simply wanted a different attorney and would disagree with any attorney appointed. *Id*. The court was unmoved by Carter's pending Attorney Grievance Commission complaint he filed against appointed counsel and referred to the complaint as frivolous. *Id*. Carter was given a choice to discharge his counsel and proceed *pro se*, or to keep assigned counsel; Carter chose to proceed *pro se*. *Id*.

At another pre-trial hearing, the court considered several motions Carter filed to suppress evidence, to return property, to sever the counts in the indictment which concerned four different burglaries at three different stores, to reconsider the matter regarding trial counsel, and for bond review. ECF No. 6-3 at 6-15. The court granted Carter's motion to compel the detention center where he was being held to arrange for Carter to view all of the video discs that the State intended to introduce into evidence at trial. *Id*. at 21. Carter's motion to suppress all evidence removed from his car, but not listed on the search warrant was denied. *Id*. at 26. The court also denied the motion to sever the counts because the evidence as to each count was relevant to a common plan or scheme. *Id*. The court viewed Carter as too great a flight risk to allow for his release on bond pending trial despite the problems incarceration presented in terms of his choice to represent himself at trial. *Id*. The court denied Carter's motion to appoint new counsel. Following the court's decision, a jury was chosen and trial began. *Id*. at 21–36 (judge's

explanation of general trial procedure and pre-emptory challenges to Carter); *id.* at 36–153 (jury voir dire).

### B. Evidence Produced at Trial

#### a. Golden China Restaurant

The State first presented evidence regarding the burglary of the Golden China Restaurant, which took place on March 30, 2012. The police officer who responded to the scene following a phoned-in report of a burglary was Officer Mi Ley. ECF No. 6-4 at 165–87. Ley testified he could not find any signs of a break-in on the doors or windows of the restaurant. *Id.* at pp. 166-67. During a search of the scene, a flashlight and a latex glove were found along with a shoe print on a stack of wrapping paper located near an air vent in the kitchen. *Id.* at 173. On the roof of the restaurant, another similar shoe print was seen next to the air vent. *Id.* at 177. Ley testified that the air vent was big enough for an average sized person to fit into. *Id.* at 178. The video surveillance taken inside the restaurant showing the actual burglary was then played for the jury. *Id.* at 179–80.

Testimony was also provided concerning the processing of the latex glove found at the scene. Detective Paul Craine testified that a buccal[1] swab, explained as a collection of the DNA cells from the inside of a person's cheek, was taken of Carter for purposes of comparing it to any DNA found at the scene. ECF No. 6-4 at 154–64. Ryan Costello testified that he swabbed the latex glove to collect any DNA that might be on it.[2] ECF No. 6-5 at 25–29. Jennifer McMurray, a forensic scientist with the Montgomery County Crime Lab, testified that she compared the DNA taken from the buccal swab of Carter with the DNA found on the latex glove at the Golden China Restaurant and concluded that the two DNA samples matched at every comparison level. *Id.* at

---

[1] Improperly spelled in the transcript as "buckle swab."
[2] Costello also testified that no latent fingerprints could be found on either the flashlight or the latex glove. ECF No. 6-5 at p. 25.

46–51. During a search of Carter's car, police found a box of latex gloves in the trunk. *Id*. at 61–62.

Mengying Wang, the owner of the Golden China Restaurant, testified that she had locked the doors the previous night; and that she left twenty one-dollar bills and six five-dollar bills in the cash register, all of which was gone the next morning. ECF No. 6-4 at 190–91.

### b. Goshen Beer and Wine Store

The Goshen store was burglarized in a similar manner on January 13, 2012, and Officer John Witherstein was the responding officer. ECF No. 6-5 at 74–77. He testified there were no signs of forced entry at the doors or windows, but that he noticed there was an access shaft when he was on the roof of the store investigating. *Id*. at 75–76.

Three employees from the Goshen store testified. Nirmal Patel, whose parents own the store, testified that the store had 12 to 14 video surveillance cameras inside and this burglary was captured on those cameras. ECF No. 6-5 at 91–95. The video was then played for the jury without objection from Carter. *Id*. at 94.

Priti Patel, who worked as a manager at the Goshen store, testified that five or six cartons of cigarettes, priced at $65.99 per carton, along with $4000 in lottery scratch off tickets were stolen. *Id*. at 95–106. She was uncertain regarding the amount of cash stolen from the store. *Id*. at 102–03.

Hedtiyakandage Nonis, who also worked at the Goshen store, testified that at the time of the burglary there was two to three-thousand dollars in cash in the office, $400 in each of six cash registers, and a box containing cash, all of which were gone after the burglary. *Id*. at 107–17.

### c.  Glenmont Beer and Wine Store

The Glenmont store was burglarized on January 20, 2008 and on April 10, 2011. Both burglaries were captured on surveillance video. ECF No. 6-6 at 68–69. Officer Oscar Jerome testified that for the January 20, 2008 burglary the suspect gained entry into the store through the roof vent. *Id*. at 40–48. Through Jerome's testimony, still pictures from the surveillance video were introduced, as well as the surveillance video itself. *Id*. Chung Lee, the owner of Glenmont, testified that following the January 20, 2008 burglary his store was left in disarray and there was cash missing as well as lottery tickets, and cigarettes. *Id*. at 53–67.

Officer Marvin Walker responded to the scene on April 10, 2011, when the Glenmont store had again been burglarized. ECF No. 6-6 at 32–39. Walker noted no damage to the doors and windows and after reviewing surveillance video, determined the suspect had come in through the sky vent. *Id*. at 34–36. Also, based on his review of the video, Walker developed a description of the suspect. *Id*. at 35–36. Chung Lee also testified with regard to the April 10, 2011 burglary of his store; and confirmed that the same thing happened this time with cash, cigarettes, and lottery tickets being stolen, and added that phone cards were taken. *Id*. at p. 59. Lee claimed that $14,000 in cash was stolen and provided authentication of the two video surveillance recordings inside the store during the burglary before they were shown to the jury without objection. *Id*. at 59, 68–69.

### d.  Defense's Case in Chief

Carter focused his defense on a theory of misidentification and limited most of his questions on cross-examination of the business owners to whether they had seen him before. *See* ECF No. 6-5 at 94–95; ECF No. 6-6 at 66. Carter also questioned Officer Walker about the suspect description he developed after watching the video surveillance. ECF No. 6-6 at 37–39.

Carter called Detective Darrell Farewell, Officer Fernandez, Detective Burgess, Lt. Robert Carter, Detective Heather Ives, Mildred and Gilbert Jones (Carter's parents), and Officer Kye Pak as witnesses during his case in chief.

Through the testimony of Detective Farewell, Carter established that the investigation into the April 10, 2011 burglary was suspended on April 19, 2011. ECF No. 6-6 at 17–27. Farewell also testified that there was no forensic evidence collected after the burglary and admitted the arrest warrant was issued one year later on April 18, 2012. *Id.*

Officer Fernandez was also called as a witness by Carter. Fernandez responded to the January 13, 2012 Goshen Beer and Wine burglary call ten days after the burglary occurred. ECF No. 6-6 at 71–72. Fernandez explained that he viewed the surveillance video and developed a description of the suspect based on that. *Id.* at 74–75. He also testified that he communicated with other Montgomery County police officers regarding the established pattern of night time commercial rooftop burglaries. *Id.* at 77–78. Carter offered into evidence an email from Fernandez that theorized the same suspect committed a burglary at Family Beer and Wine, an offense with which Carter was not charged. *Id.* at 79–80. Although the trial judge clarified for Carter three times that by introducing the document into evidence Carter was implicating himself in another crime and that he would not have allowed the state to introduce such a document, Carter acknowledged the trial judge's concerns and stated he still wished to move forward with introducing it. *Id.*

Detective Burgess was also called as witness by Carter and, similar to the Fernandez email, Burgess was asked to authenticate an email he authored regarding the burglaries. ECF No. 6-6 at 113–16. Again, the trial judge cautioned Carter that the content of the email was inculpatory, but Carter insisted on entering it into evidence. *Id.*

Lt. Robert Carter was called to testify about another police officer's use of GPS technology in her investigation of the Golden China burglary. ECF No. 6-6 at 119–21. Upon objection lodged by the State, the trial court stopped Carter's examination of the police officer and explained the matter had been settled at pre-trial. *Id*. at 121. The trial judge further noted that he was not going to let Carter cause a mistrial. *Id*.

Detective Heather Ives was called to the stand and questioned about the search warrants obtained for Carter's car. ECF No. 6-7 at 16–19. The trial court sustained an objection to the line of questioning because the matters regarding the search warrants and the evidence obtained upon their execution had already been by the court prior to the trial. *Id*.

Carter called his mother and his step father, Mildred and Gilbert Jones, to testify about his appearance from 2010 to the present. *Id*. at 20–34. Through his mother's testimony, Carter established that he had always maintained facial hair. *Id*. at 20–27.

Officer Kye Pak was called as a witness by Carter and Carter proffered that the testimony would involve an investigation of a burglary at the New Hampshire Beer and Wine, a crime for which Carter was not charged. *Id*. at 49–58. Carter wanted to elicit testimony that police believed the same suspect was involved in all of the burglaries, but the State's objection on grounds of relevance was sustained. *Id*. at 52.

Carter maintained that the trial court had not provided him with enough assistance to get his witnesses to court via subpoena and had asked for more assistance. ECF No. 6-6 at 123–24. When the State pointed out that some of the witnesses Carter had listed had never been issued a subpoena, Carter's request for additional assistance was denied. *Id*. The following day in court, Carter raised objections regarding the material provided to him by the State during discovery, insisting that the State had not provided him with an unedited version of the Golden China video

nor had they provided him with copies of the GPS warrants. ECF No. 6-7 at 5–12. During the course of argument, the State provided the trial court with a 17-page letter written by Carter to the State's Attorney stating in part that he knew what he was doing when he fired his attorney. *Id.* at 13. When it denied Carter's motions, the trial court noted that it appeared Carter was attempting to cause a mistrial, and that there had never been any GPS warrants issued nor had any GPS devices been placed on his car. *Id.* at 15.

At the end of Officer Pak's testimony, Carter again raised the issue regarding unavailable witnesses who he wished to call. ECF No. 6-7 at 58–60. The witnesses Carter asked for had not been subpoenaed, thus the court forced Carter to rest his case. *Id.*

### e. Jury's Verdict and Sentencing

The jury found Carter guilty as follows:

> Count One: second degree burglary of Golden China restaurant;
> Count Two: theft of less than $1000 from Golden China restaurant;
> Count Four: second degree burglary of Goshen Beer and Wine;
> Count Five: theft of more than $1000 but less than $10,000 of Goshen Beer and Wine;
> Count Six: malicious destruction of property at Goshen Beer and Wine;
> Count Seven: second degree burglary Glenmont Beer and Wine (2008 incident);
> Count Eight: theft of less than $1000 Glenmont Beer and Wine (2008 incident); and
> Count Nine: malicious destruction of property Glenmont Beer and Wine (2008 incident).

The jury found Carter not guilty of Count Three, malicious destruction of property at Golden China restaurant and could not reach a verdict with respect to Counts Ten, Eleven, and Twelve, which concerned the burglary of Glenmont Beer and Wine in 2011. ECF No. 6-7 at 120–22. After a brief explanation from the trial judge regarding a mistrial as to Counts Ten through Twelve, Carter moved for and was granted a mistrial on those counts. *Id.* at 126–27.

Upon advisement from the trial judge, Carter obtained counsel for purposes of the

sentencing proceeding, which took place following the preparation of a Pre-Sentence Investigation. *See* ECF No. 6-7 at 128–31. During his allocution at sentencing Carter stated, "I take full responsibility for my actions. I did break into these stores. I did take these people's property . . . and if they were in this courtroom today, I would sincerely apologize to them for doing that." ECF No. 6-8 at 30. After considering the testimony of both Carter and his mother, as well as other factors including Carter's 22-year criminal history, the opportunities Carter had to address his drug addiction issues, and the well-planned nature of each of the crimes committed, the court sentenced Carter to a total of 36 years and 120 days. ECF No. 6-8 at 34–39. The sentence consisted of three 12-year terms for the second degree burglary convictions, and two 60-day terms for the malicious destruction of property convictions, all sentences were made consecutive. *Id.* at 37–39. The theft convictions merged with the burglary convictions for purposes of sentencing. *Id.*

## C. State Appellate Review

In his direct appeal to the Maryland Court of Special Appeals, Carter, through his counsel, raised two claims: "whether the trial court erred when it prohibited Carter from introducing evidence that a crime matching the State's modus operandi theory was committed by some other person in order to prove mistaken identity;" and "whether the trial court erred in denying Carter's motion for severance on grounds that evidence of multiple charges were mutually admissible to prove identity and modus operandi, while later prohibiting Carter from submitting evidence to refute identity and modus operandi." ECF No. 6-9 at 9. Carter argued that the State's theory of the case was that the four burglaries were committed in such a similar and unique manner that they were committed by the same person, "a serial cat burglar." *Id.* 12. He further alleged that the State tied three weaker cases to one that was stronger, *i.e.*, there was

DNA evidence tying Carter to the Golden China crime, in order to garner a conviction on all counts. Despite that fact, Carter argued, he was not allowed to put on evidence of other burglaries committed in a similar manner to show that the State's theory was false. *Id*. at 12–13.

The Court of Special Appeals affirmed Carter's convictions in an unreported opinion. ECF No. 6-12. The appellate court found no abuse of discretion by the trial court when it denied Carter's motion to sever the counts because an instruction was given to the jury that they could consider the DNA evidence only with respect to the Golden China burglary and because it was not unfairly prejudicial to deny the motion to sever. *Id*. at 5–6. "In the case before us, the businesses that were burglarized were similar, the manner of entry was similar, and the video content was similar. We perceive no error." *Id*. at 6, citing *Garcia-Perlera v. State*, 197 Md. App. 534, 548 (2011).

With regard to Carter's assertion that the trial court erred in excluding the evidence he attempted to introduce, the appellate court found that if the trial court erred, the error was "harmless beyond a reasonable doubt." *Id*. at 8. The appellate court explained that:

> As we understand appellant's theory, he intended to use the evidence in question to argue that because he was not charged with the Family Beer and Wine incident, and because it was similar in modus operandi to the charged incidents, he did not commit the charged offenses. There was no evidence of another perpetrator, however, and the record reveals that it is unlikely the challenged evidence would have exculpated appellant. In closing argument, appellant emphasized that the person depicted in the videos taken of the premises on which the charged offenses occurred was not him. Clearly, the jury concluded that the suspect shown in those videos was appellant. Moreover, appellant chose to not place the police report into evidence while eliciting testimonial evidence that he wanted, *i.e.*, the police officers believed the perpetrator was the same in the charged incidents and the uncharged incident.

*Id*. Carter's subsequent petition for writ of certiorari to the Maryland Court of Appeals, filed April 3, 2014, was denied on June 19, 2014. ECF No. 6-1 at 28 (docket entries).

**D. State Post-Conviction Proceedings**

Carter filed a Petition for Post-Conviction Relief *pro se*, raising the following claims:

1.     Ineffective assistance of appellate counsel for failing to raise all issues related to the Golden China burglary. In his view, counsel should have included argument to attack the validity of the Golden China burglary instead of conceding that conviction would probably remain valid and Carter would be entitled to a new trial on the remaining counts. Carter averred that he presented five issues to appellate counsel to raise on appeal, but only the "severance argument" was adopted by counsel. ECF No. 6-13 at 3–5.

2.     The trial court erred when it denied Carter's motion to appoint new trial counsel based on counsel's conflict of interest due to an unresolved complaint filed with the Attorney Grievance Commission ("AGC"). *Id*. at 6. Carter assigns error to the trial court's failure to inquire into whether trial counsel could "provided unbiased, unemotional, and trustworthy representation . . . in a pending criminal case while simultaneously protecting her own interests created by the AGC complaint for her conduct in the same pending case." *Id*. at 7.

3.     Carter did not voluntarily waive his right to counsel. *Id*. at 9–10.

4.     The trial court erred when it did not inform Carter he had the option to ask the court to require counsel to remain as standby counsel. *Id*. at 10–11.

5.     Appellate counsel was ineffective for failing to argue that the trial court erred when it did not appoint new counsel to represent Carter at trial. *Id*. at 12.

6.     The trial court erred when it did not suppress DNA evidence.[3] Carter argues that the DNA sample taken from him was done pursuant to a search warrant that was not based on probable cause. He bases this view on his reading of the affidavit and application for the warrant, neither of which state that there is DNA evidence found at the crime scene with which his DNA sample will be compared. *Id*. at 13–18.

7.     The State failed to produce an unedited, original copy of video surveillance for the Golden China burglary.[4] *Id*. at 20–29. Carter claims the State gave him an edited version of the video "with only snippets of the Golden China burglary event and refused to obtain the original from Dave McGill" despite being ordered to do so by the trial court. *Id*. at 24. Carter bases

---

[3]     Carter alleges that appellate counsel was ineffective for failing to raise this claim on appeal. ECF No. 6-13 at pp. 18-19.

[4]     Carter also alleges that it was error constituting ineffective assistance of counsel for appellate counsel not to include this claim on appeal. ECF No. 6-13 at pp. 29-30.

his suspicions on affirmations made by the State's Attorney that Officer McGill went to the Golden China restaurant, retrieved the video surveillance, and burned a copy of it; that copy was given to the State and the defense and contains "raw material" as well as a sequenced segment made by McGill to make the video flow better. *Id*. at 22. Carter wanted to use the unedited version to introduce evidence that the State mishandled evidence, leading to an erroneous identification of him as the perpetrator.

8.    The trial court erred when Carter's request for additional witnesses – David McGill and Theresa Durham – to testify regarding whether the video from the Golden China Restaurant had been edited and what was contained in the unedited version. *Id*. at 30–34. Carter adds that the defense was not given proper advanced notice that the State intended to use "computer-generated" evidence. *Id*. at 34-36. He adds that the trial court should have allowed use of compulsory process and/or granted a continuance to secure the presence of these material witnesses. *Id*. at 36–40. Carter states that appellate counsel was ineffective for failing to include this claim in the direct appeal. *Id*. at 40–41.

9.    In an addendum to the petition for post-conviction relief, Carter asserts that appellate counsel was ineffective for failing to raise a claim regarding the trial court's failure to suppress evidence seized during a search of Carter's car. *Id*. at 91–98.

10.    He claims the State failed and refused to produce a GPS/GLI tracking warrant used to "ping" Carter's phone for 60 days and authorized Sprint/Nextel to provide historical tracking records for a period of time prior to the date of the warrant to aid in the investigation of the burglaries. *Id*. at 99–106. He adds that appellate counsel was "negligent" for failing to raise this claim on direct appeal. *Id*. at 106–7.

11.    In another supplemental filing Carter alleged that the State breached a contract with him when it did not provide him with replacement counsel following his discharge of trial counsel and that the policy of the Office of the Public Defender to refuse assignment of new counsel under these circumstances constituted "prejudicial retaliatory conduct." *Id*. at 112–17.

Prior to the post-conviction hearing, Carter filed a motion to appoint new counsel asserting that his claim regarding the discriminatory practices of the Office of the Public Defender required the court to appoint counsel without ties to that office. *See* ECF No. 1-13 at 10 (post-conviction decision), *see also* ECF No. 6-13 at 109. The motion was heard on March 27, 2015, and

subsequently denied. *Id*. Carter chose to proceed *pro se* after discharging post-conviction counsel. *Id*.

Carter called five witnesses to testify at the post-conviction hearing: Officer David McGill, Assistant State's Attorney Vlatka Tomazic, Assistant Public Defender Sheryl Statland, Montgomery County Public Defender Brian Shefferman, and Detective Theresa Durham. The evidence produced at the post-conviction hearing was summarized by the post-conviction court in its decision as follows:

> Officer McGill, a forensic specialist with the Montgomery County Police Department, testified regarding the production of surveillance footage from the Golden China Restaurant. Officer McGill explained that he collected raw footage from the surveillance system and "sequenced" that footage to create a video that was easier to view. He further testified that the cameras in the restaurant operated through a motion activation system and therefore, the only footage recorded during the burglary was for the period when [Carter] was present. Along with that testimony, a DVD was admitted into evidence that contained a twenty-three second clip of the surveillance footage, the entire eight minute and nineteen second raw footage, and the seven minute and fifty-one second sequenced video taken from the Golden China Restaurant.
>
> Ms. Tomazic, the prosecuting attorney from [Carter's] trial, testified regarding the production of evidence related to the Golden China DVD and GPS/GLI tracking of [Carter]. Ms. Tomazic testified that all discovery in the State's possession was turned over to Ms. Statland prior to the start of trial. This included all video footage and GPS/GLI information produced by the Montgomery County Police Department. Even after Ms. Statland's discharge, the State continued to provide discovery directly to [Carter]. Regarding the GPS/GLI tracking, Ms. Tomazic explained that the only GPS/GLI data collected was based on "pinging" [Carter's] cell phone in order to effectuate an arrest. At no point did the State possess any historical GPS/GLI information that could be considered "potentially exculpatory," and none of the GPS/GLI data that was collected was used at trial.
>
> Ms. Statland, [Carter's] initially appointed trial counsel, testified regarding the process of her discharge and the State's production of evidence. Ms. Statland explained that after [Carter] raised the issue of historical GPS/GLI data, she spoke with Ms Tomziac who assured her that no historical data was collected. Regarding her discharge, Ms. Statland maintained that the pending complaint with the Attorney Grievance Commission was not a cause for concern and would not have precluded her from effectively representing [Carter]. She

further testified that after her discharge, she provided all discovery in her possession to [Carter].

Mr. Shefferman, the District Public Defender for Montgomery County, testified regarding the OPD's policy for non-meritorious discharge of trial counsel. Mr. Shefferman explained that where a Defendant chooses to discharge his appointed counsel for non-meritorious reasons, the OPD does not appoint replacement counsel. Only where there is a meritorious reason for discharge will replacement counsel be provided. Mr. Shefferman further testified that pending complaints against an Assistant Public Defender do not preclude continued representation of a Defendant, unless the complaints pertain to a legal conflict of interest. [Carter's] complaint against Ms. Statland was not based on a legal conflict of interest, and therefore his reason for discharge was determined to be non-meritorious. Thus, the OPD was under no obligation to provide [Carter] with new counsel following his termination of Ms. Statland's representation.

Finally, Detective Durham, an officer assigned to investigate the Golden China robbery, testified regarding the collection and production of GPS/GLI data. Detective Durham explained that although historical GPS/GLI tracking information was requested from [Carter's] cell phone company, that data was never provided. In support of this testimony, an email from Detective Durham to Sargent Robert Grims, which read "GPS is a no go," was introduced into evidence. Detective Durham also confirmed earlier testimony by Ms. Tomziac and Ms. Statland that the only GPS/GLI utilized in this case related to "pinging" [Carter's] cell phone in order to effectuate an arrest. That information was then shared with Prince George's County Police who arrested [Carter].

ECF No. 1-13 at 10–12, *see also* ECF No. 6-14 at 8–10.

### E. Claims in this Court

Carter claims that appellate counsel was ineffective for failing to raise all of the claims he brought to counsel's attention; the post-conviction court erred when it concluded that many of his claims were waived or were not cognizable under post-conviction review; and the post-conviction court erred when it held that Carter waived his right to trial counsel and when it failed to find error in the trial court's decision not to appoint substitute counsel. ECF No. 1 at 16–36.

Respondents rest their assertion that the petition does not warrant the relief sought on the content of the post-conviction court's decision and their view that the decision contains no error and survives scrutiny under 28 U.S.C. § 2254(d). ECF No. 6.

## II.     STANDARDS OF REVIEW

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings" *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* 572 U.S. 415, 419-20 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;" or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court

precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id*. "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett,* 559 U.S 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where

state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379.

## III.    ANALYSIS

### F.  Ineffective Assistance of Counsel

When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The second prong requires the Court to consider whether there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A strong presumption of adequacy attaches to counsel's conduct, so strong in fact that a petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id*. at 696. The failure to make a frivolous motion or to make ethically improper arguments, does not establish that there was an unprofessional error, nor is there even a remote possibility that the result of the trial would have been different had the motion been made. *See Horne v. Peyton*, 356 F.2d 631 (4th Cir. 1966) (fact that counsel could have done more is insufficient for reversal absent any showing of harmful consequences).

In the context of claims regarding the effective assistance of appellate counsel, the Supreme Court has made clear that an indigent defendant does not have a constitutional right to compel his appointed appellate counsel to raise every conceivable claim on appeal. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Further, the Court observed that "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key

issues." *Id*. at 751-52.

Carter alleged at post-conviction that appellate counsel was ineffective when he failed to include claims regarding the buccal swab, the search of his car, collection of GPS/GLI information, and the failure to produce surveillance footage from Golden China Restaurant. ECF No. 6-14 at 14. Here, Carter alleges that post-conviction court erred when it applied the standard announced in *Jones v. Barnes*, *supra*; when it relied upon a letter from appellate counsel to Carter explaining that some of the issues they discussed would not be raised on appeal; and when the court failed to determine that appellate counsel's professional judgment was reasonable. ECF No. 1 at 17-18. Further, Carter asserts that appellate counsel's omission of issues related to the trial court's abuse of discretion, ineffective assistance of trial counsel, and GLI cell phone warrant record claims was prejudicial to his direct appeal, satisfying the second prong of *Strickland*. *Id*. at 18.

As noted, the law is well established regarding appellate counsel's role. Carter's claim that appellate counsel's performance was deficient is without merit, obviating the need to examine whether or not he was prejudiced by the failure to raise the numerous claims asserted by Carter. As the post-conviction court observed, and as Carter's own evidence establishes, appellate counsel advised him in two detailed letters written as follow-ups to discussions regarding issues to be raised on appeal, that the claims Carter wanted to raise would detract from an otherwise persuasive brief. *See* ECF No. 6-14 at 14-15; ECF No. 1-9 and 1-10. This Court finds no fault in the post-conviction court's conclusion that "the evidence tends to show that [appellate counsel] used his professional judgment to select an appeal strategy that would maximize [Carter's] chances of success." ECF No. 6-14 at 15. The court used the appropriate deferential standard and Carter has not presented clear and convincing evidence that the decision

is not entitled to this Court's deference.

Carter also claims ineffective assistance of trial counsel. Specifically he asserts that trial counsel was ineffective when she did not admit she had a conflict of interest in representing Carter, given that Carter filed a complaint with the AGC against her; and for failing to ask Carter or the trial judge if she (or someone else) could serve as stand-by counsel to assist Carter at trial. ECF No. 7 (Motion for Summary Judgment). Preliminarily, Carter asserts that the post-conviction court first acknowledged that his ineffective assistance of counsel claim, as well as his *Brady*[5] claim, were preserved for review, but did not specifically address his ineffective assistance of counsel claim in its decision. *Id*. at 2–3. He adds that there is no genuine dispute of material fact that the post-conviction court found his claim regarding ineffective assistance of counsel cognizable and he is entitled to "de nova" (sic) review in this Court on that claim. *Id*. at 3.

While it is true that the post-conviction court's decision does not specifically address the ineffective assistance of trial counsel, the court did address Carter's assertions that it was error for the trial court to dismiss counsel and to conclude Carter had waived his right to counsel. ECF No. 6-14 at 20–21. In analyzing that claim, which the post-conviction court conceded was not preserved as to the trial court's alleged error, the court observed that the trial court heard from counsel who assured Carter and the court that the pending complaint against her that was filed by Carter was "not a big deal" and was something that happened often to attorneys in the Office of the Public Defender. *Id*. at 21. Further, there was evidence that Carter's chief complaint, failure to obtain potentially exculpatory GPS/GLI evidence, regarding trial counsel's performance was baseless. *Id*. There was also testimony from the District Public Defender for Montgomery County at the post-conviction hearing indicating that where, as here, the complaint

---

[5]   *Brady v. Maryland*, 373 U.S. 83 (1963).

concerning counsel's representation is not for a meritorious reason no substitute counsel is provided. *Id*. at 9–10. Lastly, and perhaps most damming of Carter's assertion, is a letter written by Carter to the State's Attorney during trial indicating he knew exactly what he was doing when he discharged trial counsel. *Id*. at 21. All of this evidence supported the trial court's decision to find that Carter's discharge of counsel was some sort of a ploy or ruse to perhaps cause a mistrial. *Id*.

It follows that if Carter's reason for discharging trial counsel was meritless, trial counsel's failure to recuse herself because of a conflict of interest created by Carter's own actions was not deficient performance. Carter's claim that the AGC complaint he chose to file caused a conflict is at best misguided. A conflict of interest implicating the Sixth Amendment right to counsel requires a conflict that adversely affected the attorney's performance. *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980), *see also Nix v. Whiteside,* 475 U.S. 157, 165 (1986) ("[B]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel"). The sort of conflict of interest found to have adversely affected an attorney's performance includes situations where representation conflicts with counsel's obligations to former clients, *see e.g., Mickens v. Taylor,* 535 U.S. 162, 174 (2002); where representation implicates counsel's personal or financial interests, *see e.g., United State v. Hearst*, 638 F.2d 1190, 1193, 1194-95, 1198, n.4 (9th Cir. 1994); or fear of antagonizing the trial judge, *see e.g., United States v. Sayan*, 968 F.2d 55, 64-65 (D.C. Cir. 1992). As the state court concluded in this case, a conflict of interest does not arise where a baseless complaint is filed with the AGC by a criminal defendant who is simply dissatisfied with appointed counsel and is attempting to manipulate the system into providing him with another attorney. Indeed, Carter admits he created the "conflict of interest" when he states that he "created a real potential

ethical violation conflict of interest when he filed a formal complaint against Sherryl Statland for her conduct in a pending case." ECF No. 6-13 at p. 8 (post-conviction petition).

Carter's claim that counsel was ineffective for failing to offer the option of serving as stand-by counsel is similarly without merit. At trial, Carter made unmistakably clear his desire to discharge trial counsel. The trial court engaged in a thorough colloquy with Carter, as required by Maryland Rule 4-215, making clear the consequences of his decision to discharge counsel for the meritless reason stated. *See* ECF No. 6-14 at 21. As the post-conviction court noted, "[a]bsent a meritorious reason for discharging trial counsel, criminal defendants have no right to substitute counsel from the [Office of the Public Defender]. It is for this very reason that Md. Rule 4-215 requires courts to fully disclose the risks of discharging counsel prior to their removal from the case." *Id*. at 22.

Carter is not entitled to federal habeas relief on the ground that appellate or trial counsel were ineffective. He has failed to demonstrate that the post-conviction court's denial of relief was based on an unreasonable application of well-established law to the facts. In addition, the Motion for Summary Judgment (ECF No. 7) asserting entitlement to a de novo review of his ineffective assistance of counsel claim is denied.

### G. *Brady* Claim

Carter claims the State withheld potentially exculpatory evidence when it did not provide him with historical GPS/GLI tracking data which he claims could have shown that he was not in the vicinity of the robberies when they occurred. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary

system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675 (1985). In order to prevail on a *Brady* claim, it must be established that the evidence at issue is both favorable to the defense and that the unavailability of the evidence calls into question the result of the trial. *Id*. at 678. The Supreme Court has made it clear that there is no distinction between exculpatory evidence and impeachment evidence in the context of a *Brady* analysis. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). There is no requirement that the guilty finding must be overturned unless suppression of the impeachment evidence so limited the defense's ability to cross-examine an accusing witness that "its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678.

Facts developed during the pre-trial motions hearing and at the post-conviction hearing establish that the State was never in possession of the data Carter believes would have qualified as *Brady* material. *See* ECF No. 6-14 at pp. 16-17. The post-conviction court explained:

> Petitioner's belief that the State obtained historical GPS/GLI data stems from an "Application for Subscriber Information and Capturing Geographic Location Information" filed by Detective Theresa Durham on April 12, 2012. In that application, Detective Durham request "historic geographic location information, call detail (incoming and outgoing), and subscriber information . . . for the time period 01/01/2012 to 04/11/2012." . . . Although such information would have been relevant, as two of the alleged robberies occurred during that time period, the State never received GPS/GLI for that time period. As Detective Durham testified on November 12, 2015, police requests that cell phone information will generally include a provision for historical location information, but that information is not immediately provided. Instead, an officer would have to follow up with the cell phone provider in order to receive historical GPS/GLI.
>
> ****
>
> Without information from the owner of a cell phone that they retained exclusive possession of the phone at all times during the period in question, historical GPS/GLI merely provides the general location of the cell phone and not the individual who owns it. Given this limited usefulness and the fact that

officers had already obtained an arrest warrant for [Carter], Detective Durham never followed up to obtain the historical GPS/GLI.

ECF No. 6-14 at 17. Based upon this finding of fact, the post-conviction court found Carter's *Brady* claim unsustainable and denied relief. *Id*. This finding of fact by the state court survives the deferential scrutiny applicable to federal habeas claims; relief is denied as to this claim.

### H. Trial Court Error

The post-conviction court found most of Carter's claims were "not cognizable post-conviction claims" and relied on Maryland statutory law to reach that conclusion. *See* ECF No. 6-14 at 10–11, citing Md. Crim. Proc., Code Ann. § 7-106, *see also Oken v. State*, 343 Md. 256, 268-71 (1996) (under post-conviction statute claims are deemed waived if they could have been raised on direct appeal). "[A] federal habeas court may not review constitutional claims when a state court has declined to consider their merits on the basis of an adequate and independent state procedural rule." *Burket v. Angelone*, 208 F.3d 172, 183 (4th Cir. 2000). Further, this Court is "not at liberty to question a state court's application of a state procedural rule because a state court's finding of procedural default is not reviewable if the finding is based upon an adequate and independent state ground." *Id*. at 184 (citing *Harris v. Reed*, 489 U.S. 255, 262 (1989)). "Nor is a procedural default waived when a state court reaches the merits of a federal claim as an alternative basis for dismissal." *Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010).

Here, the post-conviction court's finding that Carter's claims regarding trial court error were not cognizable represents application of a state procedural rule which will remain undisturbed by this Court. Further, the post-conviction court's analysis of those claims in the context of Carter's ineffective assistance of appellate counsel claims is without error and represents a reasonable application of well-established law to the facts. Habeas relief is denied on this ground.

## IV.     CONCLUSION

Upon review of the Petition for Writ of Habeas Corpus, the Response along with the exhibits submitted, as well as Carter's Reply, this Court determines that Carter is not entitled to federal habeas relief. There is no basis upon which to find constitutional deficiencies in the state court proceedings, Carter having failed to rebut the presumption of correctness of the findings of fact underlying the rejection of his grounds for post-conviction or appellate relief. The petition shall be dismissed and Carter's pending Motion for Summary Judgment denied. Further, a certificate of appealability shall not issue.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U. S.C. § 2253(c)(2); *see Buck v. Davis*, 137 S.Ct. 759, 773 (February 22, 2017). The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because this Court finds that there has been no substantial showing of the denial of a constitutional right, a certificate of appealability shall be denied. *See* 28 U. S.C. § 2253(c)(2).

A separate Order follows.


Date: <u>October   2, 2018</u>                                        <u>                    /s/                    </u>
                                                                    GEORGE J. HAZEL
                                                                    United States District Judge